187 P.3d 291 (2008)
The ESTATE of John Dean STALKUP, by and through Susan STALKUP, as Personal Representative, and Susan Stalkup, individually, Respondents,
v.
The VANCOUVER CLINIC, INC., P.S., and James Hampton, M.D., Appellants.
No. 35682-1-II.
Court of Appeals of Washington, Division 2.
July 1, 2008.
*293 Mary H. Spillane, William Kastner & Gibbs, Seattle, WA, Jeffrey Richard Street, Attorney at Law, Portland, OR, for Appellants.
Steven Richard Pruzan, Attorney at Law, Seattle, WA, for Respondents.
QUINN-BRINTNALL, J.
¶ 1 The jury in a medical malpractice case returned a special verdict finding that, although Dr. James Hampton was negligent, his negligence did not cause John Stalkup's death. John's[1] widow, Susan Stalkup, moved for a judgment as a matter of law on the issue of proximate cause under CR 50(a)(1) and a new trial on the sole issue of damages under CR 59(a)(7). The trial court denied Susan's motion but held that the jury's verdict was inconsistent and ordered a new trial on all issues.
¶ 2 Hampton and the Vancouver Clinic, Inc., P.S. appeal from the new trial order claiming that, when applying the appropriate legal standard, the multiple theories presented at trial support the jury's verdict and it is not internally inconsistent. We agree with Hampton, vacate the new trial order, and remand with directions that the trial court reinstate the jury's verdict.

FACTS
Factual Background
¶ 3 In 2004, Hampton, a family practice physician, treated John on two separate occasions at the Vancouver Clinic. On March 8, John saw Hampton for the first time for a skin rash and to refill a prescription for Pravachol, a cholesterol-lowering medication his former physician had previously prescribed. Without ordering any blood tests to assess John's liver function or present cholesterol levels, Hampton authorized a refill of the Pravachol prescription. He also prescribed Lamisil for John's rash.
¶ 4 John made a second appointment to see Hampton on June 10. At the second appointment, John complained that he had been experiencing chest pains and shortness of breath when he exerted himself. He indicated these symptoms had been going on for approximately one week. John described the pain as sharp and dull with some pressure on his chest but denied experiencing any radiating pain. Hampton examined John for approximately 30 minutes. He checked John's vital signs, listened to his heart and lungs, felt his carotid arteries and pulse, and checked his abdomen. Hampton also palpated John's chest wall and confirmed that doing so reproduced John's pain.
¶ 5 Hampton told John that he likely suffered from costochrondritis, an inflammation of the chest wall. But in order to rule out an acute heart attack, Hampton performed an electrocardiogram (EKG), with normal test results. Hampton told John to take ibuprofen, reduce his activity for two to three weeks, and return if his symptoms continued beyond two or three weeks. He also told John to return immediately or go to the emergency room if his symptoms worsened or changed.
*294 ¶ 6 Nine days later, on June 19, John told his neighbors, Bobbie and Chris Blessing, who are both emergency medical technicians (EMTs), that he had pain radiating down his left arm and that his left hand was numb. He also told them that the ibuprofen was not relieving all of his pain. The Blessings expressed concern, telling John that his symptoms fit the "classic picture" of a heart attack. 1 RP at 181.
¶ 7 Later that same evening, while John was outside speaking with a friend, he collapsed in the driveway. His wife called 911. Paramedics, including the Blessings, arrived and tried to resuscitate him. Their efforts were unsuccessful, however, and paramedics pronounced John dead at the scene.
Procedural History
¶ 8 Susan, individually and as the personal representative of John's estate, sued Hampton and the Vancouver Clinic alleging that her husband's death was due to medical negligence.[2] On August 21, 2006, trial commenced in Clark County Superior Court.
A. Motion in Limine
¶ 9 Before trial, Hampton's trial counsel moved, under ER 401 and 403, to preclude Susan from alleging that, on March 8, Hampton was negligent when he failed to order blood tests to determine John's cholesterol levels and liver function before refilling the Pravachol prescription because there was no expert testimony establishing a causal link between the claimed negligence and John's death.
¶ 10 Susan's trial counsel conceded that it was "not [Susan's] claim that [John] died of . . . liver failure or problems with his liver" and that Susan did not have any evidence that Hampton's failure to run the blood tests on March 8 contributed to John's death. 1 RP at 12. Rather, Susan's trial counsel argued that evidence of Hampton's alleged negligence on March 8 should be allowed to show "a course of conduct of how [Hampton] handled this particular patient" and that Hampton was not "paying attention to the issue of [John's] potential for coronary artery disease" and "was treating [John] in a rather loose fashion." 1 RP at 11-12. The trial court instructed Susan's trial counsel to limit his discussion of Hampton's failure to conduct blood tests on March 8 to the factual background of the case and not to ascribe negligence to Hampton's conduct. See ER 404(b).
B. Trial Testimony
¶ 11 But at trial, Susan called Hampton as an adverse witness and questioned him about refilling John's Pravachol prescription on March 8 without taking a blood test to measure John's cholesterol levels. During this testimony, Hampton also acknowledged that John had certain risk factors for coronary artery disease because he was male, over the age of 45, had high cholesterol, and was overweight.
¶ 12 Dr. Cynthia Smyth, an internist, testified to the causes of chest pain, including costochrondritis, risk factors for coronary artery disease, and how the disease leads to cardiac arrest. Smyth explained the role of high density lipoprotein (HDL)[3] cholesterol and low density lipoprotein (LDL)[4] cholesterol and testified that, because of the relationship between the two types of cholesterol, it was important to take blood tests to determine the different levels.
¶ 13 Dr. Smyth testified that Hampton violated the standard of care for a general family practitioner on June 10 because he failed to adequately rule out coronary artery disease. Specifically, Smyth testified that Hampton must have suspected that John had coronary artery disease as demonstrated by the fact that he ordered an EKG. In addition, *295 Smyth testified that Hampton should have conducted blood tests on John when he complained of chest pains[5] to make sure his cholesterol levels were under control and because there are specific blood tests that can detect if chest pains are due to ischemia, a type of blood vessel constriction.[6]
¶ 14 Dr. Smyth also testified that the standard of care required that Hampton promptly give a patient presenting with John's symptoms a stress test or refer him to a cardiologist. Smyth further testified that John was not suffering from costochrondritis as Hampton had diagnosed on June 10, but rather was experiencing angina pain due to coronary artery disease. Smyth opined that Hampton should not have told John that he had costochrondritis based on the normal EKG and that, under proper care, a cardiologist would have diagnosed the coronary artery disease and treated it with a stent.[7] Two of Susan's other experts, Dr. Samuel Cullison and Dr. Jeffrey Westcott opined that John would not have died if the coronary artery disease had been timely diagnosed.
¶ 15 Susan's medical experts, Drs. Smyth, Westcott, and Cullison, opined that John died of coronary artery disease. The Clark County medical examiner, Dr. Dennis Wickham, listed the cause of John's death as occlusive atherosclerotic cardiovascular disease, also called coronary artery disease. Wickham testified that a blocked artery caused John's heart to develop an abnormal rhythm, called a ventricular fibrillation, which resulted in a sudden cardiac arrhythmia.[8]
¶ 16 Hampton questioned the conclusion that John had died of coronary artery disease. Hampton testified that John died of a heart arrhythmia, possibly due to coronary artery disease. He further testified that he did not believe it could be said that, on a more probable than not basis, John had died of coronary artery disease.
¶ 17 Dr. Bradley Evans, a cardiologist, agreed with Hampton that John died of sudden cardiac arrhythmia, in the presence of coronary artery disease. Evans further testified that there was insufficient information to determine whether coronary artery disease caused the sudden cardiac arrhythmia. Evans also noted that there are individuals who die of sudden cardiac arrhythmia who do not have coronary artery disease. And Evans testified that, under a more probable than not basis, he could not testify that the coronary artery disease and the sudden cardiac arrhythmia were related.
¶ 18 Dr. Evans also testified that it was unclear whether John would have survived if Hampton had referred him to a cardiologist and the cardiologist had timely diagnosed John with coronary artery disease. Evans opined that John's survival would have been dependent on the timing of the treatment,[9] and he noted that a timely diagnosis of coronary *296 artery disease did not reduce the risk that the patient could have a sudden cardiac arrhythmia. But Evans acknowledged that if John had been successfully revascularized before June 19, and his death was due to coronary artery disease instead of sudden cardiac arrhythmia as Evans believed, John likely would not have died.[10]
¶ 19 Dr. Addison Wilson also testified that John died of an arrhythmia in the presence of coronary artery disease. But, like Drs. Evans and Hampton, she expressed reservations that the arrhythmia was related to the coronary artery disease.
¶ 20 Susan and Hampton proposed nearly identical special verdict forms. The special verdict form was a customized version of 6 Washington Practice: Washington Pattern Jury Instructions: Civil 45.22, at 408 (5th ed.2005). Neither party objected to the special verdict form that the trial court gave to the jury. The special verdict form asked two questions: (1) whether the defendants were negligent and, if the jury's answer to that question was "yes," (2) whether such negligence was a proximate cause of John's death. On August 29, 2006, the jury found that Hampton was negligent and answered the first question "yes," but it found that this negligence was not a proximate cause of John's death and answered the second question "no."
C. Post-Trial Motions
¶ 21 On September 7, 2006, Susan moved for judgment as a matter of law on the issue of proximate cause under CR 50(a)(1) and for a new trial on the issue of damages only under CR 59(a)(7). In support of these motions, Susan argued that there was "no dispute" that (1) John had died of an arrhythmia due to coronary artery disease and (2) his death would have been prevented had the disease been diagnosed before June 19. Susan also argued that, because the jury found "Hampton was negligent in failing to properly perform a workup on [John] or refer him to a cardiologist," a "finding that . . . Hampton's negligence was not a proximate cause of [John's] death . . . cannot be supported." Clerk's Papers (CP) at 92.
¶ 22 Hampton argued that the evidence presented at trial supported the jury's answers to questions 1 and 2 on the special verdict form because Susan had introduced testimony that Hampton should have done blood tests on both March 8 (for liver function and cholesterol) and on June 10 (for ischemia), but failed to present any evidence that either failure proximately caused John's death. Hampton argued that, based on the evidence Susan elicited, the jury could have found that Hampton was negligent for failing to do blood tests but that the lack of these tests was not a proximate cause of John's death.
¶ 23 Hampton also argued that, alternatively, the jury could have found he was negligent in failing to test more aggressively for coronary artery disease or for failing to refer John to a cardiologist but that coronary artery disease was not the cause of John's death or that a diagnosis before June 19 would not have prevented his death.
¶ 24 The trial court denied Susan's motions for a judgment as a matter of law on the negligence issue as well as her motion for a new trial on the sole issue of damages and instead exercised its authority to order a new trial on its own motion "on all issues, due to imprecision in the verdict form." CP at 68. Hampton timely appeals.

ANALYSIS
Order Granting New Trial
¶ 25 When the trial court ordered a new trial, it explained that it was relying on State v. Golladay, 78 Wash.2d 121, 470 P.2d 191 (1970),[11] a criminal case which held that, where there are two theories submitted and one is insufficient, a new trial is required because it is unclear which theory the jury chose to believe.
*297 ¶ 26 The trial court based the new trial order on several grounds: (1) it found that the verdict forms and instructions failed to adequately set out Susan's theories and, therefore, failed to properly state the questions which the jury was required to answer; (2) it held that Evans had been critical of the proposition that proper diagnosis or referral would have saved John's life but because he did not testify in appropriate terms of reasonable medical probability, this testimony was insufficient to support the conclusion that something other than coronary artery disease had caused the death; and (3) it applied a test for prejudice from an inconsistent verdict set out in Golladay to Hampton's arguments and found that, because it could not find that the jury had based its negligence finding on the failure to administer blood tests as opposed to the failure to diagnose coronary artery disease or not referring John to a cardiologist, the verdict was incomprehensible.
¶ 27 Under CR 59(d), a trial court may order a new trial on its own initiative for any reason that it might have granted a new trial on the motion of a party. When the party benefiting from a new trial order has standing to raise an issue in support of a new trial, the trial court may grant a new trial on that basis on its own motion. But if the party does not have the ability to move for a new trial on that basis, the trial court may not use such reasoning to vacate the jury's verdict. See CR 59(d).[12]
A. Deficiencies in Special Verdict Form
¶ 28 To the extent that the trial court's new trial order is based on deficiencies in the special verdict form, it lacks adequate support. Both parties proposed special verdict forms nearly identical to that the court gave without objection. Accordingly, neither party could request a new trial claiming a deficiency in a special verdict form it had expressly requested nor may the trial court base an order for a new trial on that ground. See Sdorra v. Dickinson, 80 Wash. App. 695, 703, 910 P.2d 1328 (1996) (because the plaintiffs submitted the verdict form at issue, the plaintiffs invited the error and could not complain on a motion for new trial or on appeal that the verdict forms were inconsistent). The order for a new trial cannot be affirmed on this basis.
B. Dr. Evans's Testimony
¶ 29 Likewise, to the extent that the trial court's new trial order is based on Dr. Evans's failure to testify to a reasonable medical certainty, Susan did not object to Evans's testimony on this basis and she waived any argument that Hampton failed to lay a proper foundation for admitting Evans's opinion that coronary artery disease did not cause the arrhythmia that caused John's death. Payless Car Rental Sys., Inc. v. Draayer, 43 Wash.App. 240, 243, 716 P.2d 929 (1986) (failure to object to a witness's testimony on the basis of foundation waives the issue for appeal) (citing Drake v. Ross, 3 Wash.App. 884, 886-87, 478 P.2d 251 (1970)). Because Susan's failure to raise a timely foundation objection precludes her from moving for a new trial on that basis, the trial court cannot base its decision to order a new trial on that ground. In ruling that Evans's testimony, which was admitted without a foundation objection, was legally insufficient for want of such foundation, the trial court was belatedly ruling on an objection never made or preserved for review and, in effect, substituting its judgment of the weight to be given Evans's testimony for the jury's judgment. The trial court may not substitute its judgment of the weight of the evidence for the jury's. See Tincani v. Inland Empire Zoological Soc'y, 124 Wash.2d 121, 131, 875 P.2d 621 (1994) (a trial court may not substitute its judgment for that which is within the province of the jury) (citing Blue Chelan, Inc. v. Dep't of Labor & Indus., 101 Wash.2d *298 512, 515, 681 P.2d 233 (1984)). The order for a new trial cannot be affirmed on this basis.
C. Inconsistent Verdict
¶ 30 In addition, the trial court's oral ruling reveals that it applied the wrong legal standard in evaluating the consistency of the jury's answers on the special verdict form. First, we note that, despite the trial court's pre-trial ruling limiting such testimony, Susan elicited evidence of Hampton's negligent failure to conduct cholesterol and liver function blood tests on March 8 and did not present evidence that this failure caused John's death. Thus, she actively produced evidence of negligence unrelated to John's death and may not complain that such evidence confused or misled the jury. See Ang v. Martin, 118 Wash.App. 553, 561-62, 76 P.3d 787 (2003) (otherwise inadmissible evidence is admissible if a party opens the door to the evidence during direct examination and the evidence is relevant to some issue at trial) (quoting State v. Gefeller, 76 Wash.2d 449, 455, 458 P.2d 17 (1969)), aff'd, 154 Wash.2d 477, 114 P.3d 637 (2005).
¶ 31 At the post-trial motion, Susan argued that the evidence does not support a finding of negligence without an accompanying finding of proximate cause and that the jury's verdict to the contrary was necessarily inconsistent. Hampton contends that, based on the evidence the jury heard and giving Hampton the benefit of all reasonable inferences, there are multiple ways in which the jury's findings of negligence but not proximate cause can be reconciled.
¶ 32 As noted above, a trial court may order a new trial on its own initiative for any reason that it might have granted a new trial on the motion of a party. CR 59(d). When we review a special verdict form that appears to be inconsistent, we must reconcile the jury's answers when possible. Alvarez v. Keyes, 76 Wash.App. 741, 743, 887 P.2d 496 (1995). But if the verdict contains contradictory answers to interrogatories making the jury's resolution of the ultimate issue impossible to determine, a new trial is required. In making our analysis, we may not substitute our judgment for the jury's. Alvarez, 76 Wash.App. at 743, 887 P.2d 496 (citing Myhres v. McDougall, 42 Wash.App. 276, 278, 711 P.2d 1037 (1985)). Our Supreme Court stated that when a court reviews a jury's verdict
[the] court will not willingly assume that the jury did not fairly and objectively consider the evidence and the contentions of the parties relative to the issues before it. Phelps v. Wescott, 68 Wash.2d 11, 410 P.2d 611 (1966). The inferences to be drawn from the evidence are for the jury and not for [the] court. The credibility of witnesses and the weight to be given to the evidence are matters within the province of the jury and even if convinced that a wrong verdict has been rendered, the reviewing court will not substitute its judgment for that of the jury, so long as there was evidence which, if believed, would support the verdict rendered. Burke v. Pepsi-Cola Bottling Co., 64 Wash.2d 244, 391 P.2d 194 (1964).
Burnside v. Simpson Paper Co., 123 Wash.2d 93, 108, 864 P.2d 937 (1994) (emphasis omitted) (quoting State v. O'Connell, 83 Wash.2d 797, 839, 523 P.2d 872 (1974)).
¶ 33 A jury verdict finding that a defendant is negligent but that the negligence was not a proximate cause of the plaintiff's injuries is not inconsistent if there is evidence in the record to support a finding of negligence but also evidence to support a finding that the resulting injury would have occurred regardless of the defendant's actions. Brashear v. Puget Sound Power & Light Co., 100 Wash.2d 204, 209, 667 P.2d 78 (1983).
¶ 34 In Brashear, a cable television installer sued a power company for injuries he suffered when he climbed a utility pole and touched an ungrounded lamp. 100 Wash.2d at 205-06, 667 P.2d 78. At trial, the plaintiff presented evidence and argument supporting four distinct theories as to how the utility company had been negligent. Brashear, 100 Wash.2d at 206, 667 P.2d 78. The trial court submitted a two-part special verdict form to the jury, and the jury found that the power company was negligent but that its negligence was not a proximate cause of the plaintiff's injuries. Brashear, 100 Wash.2d at 206, *299 667 P.2d 78. The trial court entered judgment on the verdict, dismissing the complaint. Brashear, 100 Wash.2d at 206, 667 P.2d 78. Our Supreme Court granted a new trial based on an improper jury instruction but it also explicitly found that, although such a verdict appears inconsistent, it is not in fact inconsistent if there is evidence in the record to support a finding of negligence but also evidence that the injury would have occurred regardless of the defendant's actions. Brashear, 100 Wash.2d at 209, 667 P.2d 78.
¶ 35 Both Hampton and Susan rely on Brashear for support. Hampton argues that the trial court should have inferred, as the Brashear court did, that the jury found the defendant negligent but that either causation evidence did not exist or was not persuasive enough to convince the jury that such negligence was a proximate cause of John's death and the trial court should have reconciled the jury's answers accordingly. Susan argues that here, like Brashear, the trial court improperly instructed the jury and, thus, a new trial is required. Susan's reliance on Brashear is misplaced.
¶ 36 In Brashear, the trial court failed to instruct the jury properly on the issue of proximate cause in a case in which a non-party may have contributed to the defendant's negligence to produce the injury. 100 Wash.2d at 207-09, 667 P.2d 78. Here, there was no such error. The trial court expressed concern that the special verdict form did not properly instruct the jury on each of the plaintiff's theories of negligence and stated that it could not discern which theory the jury relied on to come to its conclusion. But both parties approved the instructions and verdict form. Hampton and Susan proposed, almost word for word, forms identical to the special verdict form.[13] The failure of a party to object to instructions or the special verdict form precludes that party's later argument that they were denied "substantial justice" under CR 59(a)(9). Cerjance v. Kehres, 26 Wash.App. 436, 441, 613 P.2d 192 (1980). The trial court's new trial order cannot be affirmed on this ground.
Failure to Conduct Blood Tests
¶ 37 Hampton argues that the jury could have found him negligent only for failing to conduct blood tests during the March 8 visit, but that there was no evidence from which it could find that such negligence was a proximate cause of John's death and, because Susan invited any error regarding the blood test evidence, the verdict was not inconsistent.
*300 ¶ 38 Here, Susan elicited testimony criticizing Hampton for failing to conduct blood tests on John during the March 8 visit and admittedly failed to present any evidence that the failure was the proximate cause of John's death. Her trial counsel also discussed Hampton's failure to conduct blood tests on March 8 during his opening and closing arguments. But Susan failed to request an instruction for the jury outlining the specific grounds on which she alleged negligence; simply because she did not intend for the jury to consider Hampton's failure to conduct blood tests on March 8 as evidence of his negligence does not mean that the jury erred if it considered the evidence she presented. If Susan had a limited purpose in mind, she should have made that purpose clear to the jury. Under the doctrine of invited error, counsel cannot "`set up an error at trial and then complain of it on appeal.'" Horne v. Aune, 130 Wash.App. 183, 191 n. 2, 121 P.3d 1227 (2005) (quoting Casper v. Esteb Enters., Inc., 119 Wash.App. 759, 771, 82 P.3d 1223 (2004)), review denied, 157 Wash.2d 1015, 139 P.3d 350 (2006).
Failure to Diagnose or Treat Coronary Artery Disease
¶ 39 Hampton also argues that the jury could have found that he was negligent for failing to investigate coronary artery disease adequately or failing to refer John to a specialist but did not believe that coronary artery disease caused John's death or that a greater workup on June 10 would have prevented John's sudden death. We agree.
¶ 40 Here, contrary to Susan's assertions, there was evidence that John's sudden cardiac arrhythmia and coronary artery disease were not necessarily related. Dr. Evans testified that, although John did have coronary artery disease, it may not have caused the sudden cardiac arrhythmia. And Evans specifically stated that he did not believe, on a more probable than not basis, that John's coronary artery disease caused his sudden cardiac arrhythmia. He went on to testify that, even if John had been diagnosed with coronary artery disease before June 19, he was still at risk for sudden cardiac arrhythmia and, even if his death was in fact due to coronary artery disease, he may not have received treatment quickly enough to save his life or the treatment may not have been successful. In addition, Hampton testified that, although it was evident that John suffered from coronary artery disease, it was unclear if it caused his sudden cardiac arrhythmia or if the two were unrelated.
¶ 41 Because there was evidence that coronary artery disease did not cause John's death, a reasonable juror could have found that John's death was not caused by his coronary artery disease and, thus, that any failure by Hampton to do a more thorough workup on John or to timely refer him to a cardiologist was not a proximate cause of his death. There was also evidence that John would have died even if Hampton had diagnosed the coronary artery disease or referred John to a specialist. Here, John failed to follow Hampton's advice on June 10 that he return or go to the emergency room if his symptoms worsened or changed. On June 19, the day he died, he failed to go to the hospital emergency room after the Blessings warned him that he appeared to be having "classic symptoms" of a heart attack.
¶ 42 Susan bore the burden of proving by a preponderance of the evidence that Hampton's negligence was the proximate cause of John's death; Hampton was not required to disprove her theories. See RCW 7.70.040. Because jurors are the sole judges of the credibility of witnesses and are not required to accept the opinion of any expert witness, the jury could have accepted Dr. Hampton's and Dr. Evans's testimony, simply disbelieved plaintiff's experts, or found that John's death resulted from his failure to follow Hampton's advice that he go to an emergency room if his symptoms worsened or the Blessings' warnings that he appeared to have classic symptoms of a heart attack. See Morse v. Antonellis, 149 Wash.2d 572, 574, 70 P.3d 125 (2003); Reynolds v. Donoho, 39 Wash.2d 451, 458-59, 236 P.2d 552 (1951). Even in those instances, where several competent experts concur in their opinion and the opposing party does not offer contrary expert evidence, the jury is bound to decide the issue on its own fair judgment, assisted by the expert testimony. Richey & Gilbert Co. v. Nw. Natural Gas Corp., 16 Wash.2d 631, 649-50, 134 P.2d 444 (1943).
*301 ¶ 43 In this case, there was more than one scenario under which the jury's findings of negligence but lack of proximate cause can be reconciled. Because the jury's answers could reconcile, the trial court erred when it granted a new trial based on the "inconsistency" of the jury verdict.
The Trial Court's Reliance on Golladay
¶ 44 Furthermore, the trial court erred when it relied on the Golladay[14] standard for evaluating the sufficiency of the evidence supporting alternative means applicable in a criminal case to the jury's verdict in a civil case. In a criminal case, proof must be beyond a reasonable doubt to satisfy due process; in a civil case, a preponderance of the evidence is sufficient. It is frequently said that a trial court abuses its discretion when it applies the wrong law. See, e.g., State v. Lord, 161 Wash.2d 276, 284, 165 P.3d 1251 (2007) (a trial court abuses its discretion when it applies the wrong legal standard); Gillett v. Conner, 132 Wash.App. 818, 822, 133 P.3d 960 (2006); but see State v. Hatley, 41 Wash.App. 789, 793 n. 2, 706 P.2d 1083 (abuse of discretion standard does not apply when the trial court erred in applying the law), review denied, 104 Wash.2d 1024 (1985). To the extent that this statement of the abuse of discretion standard suggests that the trial court has discretion to choose the applicable law, it misstates the proposition. If a trial court has tenable grounds for a decision but applies the wrong law, it errs as a matter of law. Moreover, whatever its stated reasons under the inapplicable standard, these reasons are no longer reasonable under the controlling legal standard.
¶ 45 Accordingly, we vacate the new trial order and remand for reinstatement of the jury verdict.
We concur: ARMSTRONG, J., and VAN DEREN, C.J.
NOTES
[1] We use first names for clarity.
[2] Susan also claimed "lack of informed consent," but the trial court dismissed that claim and it is not at issue on appeal. CP at 4-5.
[3] HDL cholesterol, the "good cholesterol," can remove cholesterol from plaque in arteries and transport it back to the liver for excretion or reutilization. A high level of HDL cholesterol seems to protect against cardiovascular diseases and low HDL cholesterol levels increase the risk for heart disease.
[4] LDL cholesterol, the "bad cholesterol," transports cholesterol to the arteries and can help create plaque, increasing risk for heart disease.
[5] Hampton's brief suggests that Dr. Smyth criticized Hampton for failing to conduct blood tests on March 8, but her testimony clearly criticizes Hampton for failing to conduct blood tests on June 10. She did not testify about Hampton's standard of care during the March 8 appointment. Susan, however, did testify that Hampton failed to take blood tests on March 8.
[6] Ischemia is a local deficiency caused by constriction or obstruction of blood vessels. Medical Dictionary Online, http://www.online-medical-dictionary. org/omd.asp?q=ischemia (last visited June 19, 2008).
[7] A stent is a small, lattice-shaped, metal tube that a surgeon inserts permanently into an artery that has become too narrow due to coronary artery disease to allow proper blood flow. U.S. Food and Drug Administration, http:// www.fda. gov/hearthealth/treatments/medicaldevices/stent. html (last visited June 19, 2008).
[8] Coronary artery disease is a condition in which plaque builds up inside the coronary arteries. These arteries are responsible for supplying the heart muscle with oxygen-rich blood. When the plaque narrows or blocks the coronary arteries, blood cannot reach the heart muscle, which can cause a heart attack. In addition, coronary artery disease can weaken the heart muscle and lead to heart failure and arrhythmias. Heart failure is a condition in which the heart cannot pump enough blood through the body. An arrhythmia disrupts the speed and rhythm of the heartbeat, often leading to sudden death. National Heart Lung and Blood Institute, http://www. nhlbi.nih.gov/health/dci/Diseases/Cad/CAD_What Is. html (last visited June 19, 2008).
[9] Specifically, Dr. Evans testified that, if John had taken a treadmill test on June 12, an angiogram on June 18, and been scheduled for surgery on June 25, he would have likely still died as a result of sudden cardiac arrhythmia regardless of the diagnosis.
[10] Dr. Evans also testified that sometimes, when doctors attempt to insert a stent to open up a blocked artery, they are unable to complete the procedure.
[11] Golladay was overruled by State v. Arndt, 87 Wash.2d 374, 553 P.2d 1328 (1976).
[12] CR 59(d) states:

Not later than 10 days after entry of judgment, the court on its own initiative may order a hearing on its proposed order for a new trial for any reason for which it might have granted a new trial on motion of a party. After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion. When granting a new trial on its own initiative or for a reason not stated in a motion, the court shall specify the grounds in its order.
[13] Susan's proposed verdict form stated in relevant part:

We, the jury, make the following answers to the questions submitted by the court.
Question No. 1: Were any of the following negligent?
Answer "yes" or "no" after the name of the defendant.
Answer: Yes No
Defendant James Hampton, M.D. ___ ___
Defendant The Vancouver Clinic ___ ___
If you answered Question No. 1 "no" as to all defendants, sign and return this verdict.
If you answer Question No. 1 "yes" as to any of the defendants, answer Question No. 2.
Question No. 2: Was such negligence a proximate cause of injuries to one or more of the plaintiffs? Answer "yes" or "no" after the name of the defendant, if any, found negligent by you in Question No. 1.
Answer: Yes No
Defendant James Hampton, M.D. ___ ___
Defendant The Vancouver Clinic ___ ___
If you answer Question No. 2 "no" as to all defendants, sign and return this verdict.
If you answer Question No. 2 "yes" as to any of the defendants, answer Question No. 3.
CP at 29-30.
Hampton's proposed jury instruction stated in relevant part:
We, the jury, being first duly sworn, do hereby find our verdict as follows:
1. Were defendants negligent in one or more of the ways claimed by the plaintiff?
ANSWER: ___ YES ___ NO
If your answer to Question 1 is "No," then your verdict is for defendants. The presiding juror should sign this form and summon the bailiff.
If your answer to Question 1 is "Yes," proceed to Question 2.
2. Did the negligence of defendants cause the death of [John]?
ANSWER: ___ YES ___ NO
If your answer to Question 2 is "No," then your verdict is for defendants. The presiding juror should sign this form and summon the bailiff.
CP at 53.
[14] Although the trial court did not rely on Golladay in its written order, it made clear that it based its reasoning on the case.