IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Estate of | ) | |
| | ) | No. 37986-8-III |
| LAWRENCE D. GOLDBERG. | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

SIDDOWAY, J. — Following a one-day evidentiary hearing of a TEDRA[1] petition

challenging the validity of a will allegedly executed by Lawrence D. Goldberg, the trial

court found it had not been executed in accordance with required formalities and was

invalid.

Jennifer Allen, the sole beneficiary and designated personal representative under

the will, appeals. She reprises an argument she made for the first time four months after

trial: that evidence of unsworn statements by the only surviving individual who allegedly

witnessed the will, on which the trial court relied, could be considered only for

impeachment. The result, she argues, is that the evidence is insufficient to support the

trial court's findings. As ruled by the trial court when the argument was raised, an

objection that the evidence was hearsay and admissible only for impeachment purposes

was waived. For that reason, and because any error in other factual findings she

---

[1] Trust and Estate Dispute Resolution Act, chapter 11.96A RCW.

challenges are immaterial, the trial court's order invalidating the December 2014 will is affirmed.

## FACTS AND PROCEDURAL BACKGROUND

Lawrence D. Goldberg died on September 22, 2018. Several weeks later, Rachael Goldberg, Dr. Goldberg's daughter, filed a petition for letters of administration and for an order granting nonintervention powers. Her petition alleged on information and belief that Dr. Goldberg died intestate. It alleged that he was survived by three children: herself, and two surviving sons. Letters of administration were entered on October 12.

Less than two weeks later, Jennifer Allen moved the probate court to revoke the letters of administration based on a will that she alleged Dr. Goldberg executed several years earlier, on December 18, 2014. Her declaration in support of the motion stated she had known Dr. Goldberg for approximately nine years, and the two were roommates for three and a half years. The will, which she filed, expressly disinherited Dr. Goldberg's two sons, but made no mention of Rachael. Ms. Allen questioned whether Rachael was Mr. Goldberg's daughter, stating that Mr. Goldberg never told her he had a daughter.

The will filed by Ms. Allen was witnessed by Tracy Potter and Betty Jo Potter, who lived near Ms. Allen. Betty Jo was Tracy Potter's elderly mother. The Potters lived together on acreage where they boarded horses. Ms. Allen boarded horses at the Potters' property.

2

The will was not self-proved by an affidavit signed at the time of its execution. To address that deficiency, Ms. Allen obtained a two-page declaration from the Potters after Dr. Goldberg's death. The Potters signed this supplemental declaration the day before Ms. Allen filed it with the court. The supplemental declaration states that on the December 18, 2014 date of "the attached will of **Lawrence David Goldberg**" the Potters were present when Dr. Goldberg signed the will and asked that they act as witnesses, and they signed the will as witnesses at that time. Clerk's Papers (CP) at 37. No will was attached to the supplemental declaration.

One of Mr. Goldberg's sons, Cole Goldberg, objected to Ms. Allen's motion and sought appointment as a co-personal representative with his sister. He also filed a TEDRA action.

The trial court admitted the December 2014 will to probate shortly after Ms. Allen filed it, but its order interlineated a notation that the will was being admitted as Mr. Goldberg's "presumptive" last will and testament. CP at 132. The court appointed a professional fiduciary to serve as personal representative rather than Ms. Allen. It entered a preliminary injunction freezing the assets of Mr. Goldberg's estate.

The parties stipulated to consolidate the TEDRA action with the probate. In a first amended TEDRA petition filed in March 2019, Rachael and Cole Goldberg contested the validity of the will, alleging (1) it failed to comply with the requirements of RCW 11.12.020, (2) fraud, (3) lack of testamentary capacity, (4) the will was the product of

3

Ms. Allen's undue influence, and (4) Ms. Allen engaged in the unauthorized practice of law.

Before the Goldbergs filed the amended TEDRA petition, their lawyers had hired a private investigator, John Visser, to interview the Potters about their involvement in the execution of the will and the supplemental declaration. On an afternoon in January 2019, Mr. Visser traveled to the Potter residence, where Tracy Potter answered the front door. According to Mr. Visser, he told Mr. Potter who he was, that he was working for the Goldbergs, and that he wanted to ask Mr. Potter and his mother to verify documents signed in 2014 and determine whether Dr. Goldberg was present when they were signed. Mr. Potter agreed to speak with Mr. Visser but said his mother was medicated for a recent hip injury and would not be able to answer his questions.

Because Ms. Potter was resting, the two men stepped outside to talk. Mr. Visser used the trunk of his car as a makeshift desk, on which he placed his laptop in order to show Mr. Potter copies of the will and the signed page of the declaration completed after Mr. Goldberg's death. He would later describe Mr. Potter as "very friendly and very nice and cooperative . . . there was no objections to chatting with me in any way." Report of Proceedings (RP) (Trial) [2] at 59.

---

[2] Several separately paginated reports of proceedings are included in the record on appeal. The report of the evidentiary hearing is referred to as "RP (Trial)." The reports of posttrial hearings are identified by the hearing date.

With Mr. Potter's permission, the interview was recorded using Mr. Visser's telephone, and a transcript of the interview was later admitted by stipulation at the TEDRA hearing. It reflects the following questions and answers about Mr. Potter's signature witnessing the will:

> [MR. VISSER]: I'm out here with Tracy Potter. Tracy Potter's outside with me looking at some signature that's a testation clause that indicates something about a last will and testament. And it's a signature that has Tracy's signature and Betty's signature.
>
> MR. POTTER: Yeah.
>
> . . . .
>
> MR. VISSER: Did you sign that?
>
> MR. POTTER: Yes.
>
> MR. VISSER: Who brought you this form to sign?
>
> MR. POTTER: Jennifer.

Ex. 4 (interview transcript), at 2-3.

Moments into the interview, Ms. Allen and her husband arrived at the Potter residence, saw Mr. Visser speaking with Mr. Potter, and parked behind Mr. Visser's car. Mr. Potter later explained to Mr. Visser that Ms. Allen came to the property daily to take care of her horse. At the TEDRA hearing, Mr. Visser described Ms. Allen's demeanor when she disembarked from the car and approached the men as anxious and annoyed. She questioned Mr. Visser about who he was and why he was speaking to Mr. Potter. When Mr. Visser identified himself as an investigator and said, "[I]t's . . . probably not appropriate for you guys to stand here while I'm talking to him about something that has

5

to do with this whole case," Ms. Allen protested that Mr. Potter had already been to court and had told the Goldbergs' lawyers what he knew. Ex. 4, at 5. But she and her husband acceded to Mr. Visser's request for privacy and left for the horse barn down the hill.

Mr. Visser continued to ask Mr. Potter questions and Mr. Potter continued to affirm that it was Ms. Allen who asked him and his mother to sign the will. During the interview, Mr. Potter referred to Dr. Goldberg as "Larry." Asked by Mr. Visser if he ever had a conversation with Larry about his will, Mr. Potter answered, "No, not really," adding, "[H]e'd come around here once in a while and ride the horse." Ex. 4, at 9-10. Toward the end of the interview, Mr. Visser asked if Mr. Potter's mother was likely to remember "any of this stuff," given her condition, and Mr. Potter answered, "Nope. I can guarantee you, not really." Ex. 4, at 18.

The interview ended after Mr. Potter was informed by Ms. Allen's husband that horses were loose. At that point, Mr. Visser had been questioning Mr. Potter about Dr. Goldberg's condition in the last years of his life, because Mr. Potter told him Ms. Allen had served as Dr. Goldberg's caregiver. Mr. Potter said that Dr. Goldberg seemed to be coherent but "kept going downhill and downhill," and had "quit coming down." Ex. 4, at 12-13. Mr. Potter then left for the barn to deal with the errant horses.

Mr. Visser packed his things but before leaving he walked to where he could see Mr. Potter at the barn and called to him, asking if he needed any help. Mr. Potter was standing near Ms. Allen's car, which was parked near the entry to the barn. Mr. Visser

could hear that Mr. Potter was talking to someone who was inside the barn. When Mr. Potter yelled back, "[W]e're good, we're fine," Mr. Visser got in his car and drove away. RP (Trial) at 65.

Within a few minutes of leaving, Mr. Visser's phone rang, and it turned out to be Mr. Potter. At the trial that took place several months later, Mr. Visser described their conversation:

> Mr. Potter . . . said hey, this is Tracy and had kind of informed me that he remembered how things went now and he remembered that Mr. Goldberg was in fact present when he had signed the document that I had showed him and I asked him immediately if Jennifer Allen had talked to him at the conclusion of my interview and he agreed that she had spoken to him and reminded him that Mr. Goldberg was in fact present and I asked him if he was speaking for himself or if he was speaking for someone else and he was kind of firm about it and he said well, this—this is what I remember and he said I'm fucked. I just fucked myself.

RP (Trial) at 66. Mr. Visser testified that he tried to calm Mr. Potter, who seemed "pretty anxious." *Id.* Mr. Visser testified that he asked Mr. Potter if he was feeling pressured or manipulated, and Mr. Potter paused and "he just—he kept going back to well, I'm gonna—I'm gonna come into court and I'm gonna testify to the fact that Mr. Goldberg was there . . . ." RP (Trial) at 66-67.

Betty Jo Potter passed away the following month, without having been interviewed or deposed about her involvement in witnessing the will and signing the supplemental declaration.

7

Mr. Potter was deposed by the Goldbergs' lawyers a couple of days before the TEDRA hearing. Ms. Allen and her husband drove Mr. Potter to the deposition.

During the deposition, Mr. Potter was presented with the will, which was marked as exhibit 1, and the supplemental declaration, which was marked as exhibit 2. He was asked to look at exhibit 2, and was asked where he was when he signed it; he answered that he was at his house. Asked who was present when he signed exhibit 2, Mr. Potter answered, "Me and my mother and Larry." Ex. 3 (deposition transcript), at 19. The questioning continued:

> Q. Can you, please, look at Exhibit 2.
> A. Yeah.
> Q. Take your time.
> A. Yeah, I looked at it.
> Q. Okay. So you're testifying that Larry was there when you signed the document, that's been marked as Exhibit 2?
> A. Yeah.
> Q. Okay. Who brought you the document that's been marked as Exhibit 2?
> A. Larry did.

Ex. 3, at 19-20.

The Goldbergs' lawyer then turned his questioning to whether Mr. Potter talked to Ms. Allen about Dr. Goldberg's estate in 2018 or 2019. He had only asked one question before Ms. Allen interjected:

> [MS.] ALLEN: Tracy, you should put your glasses on.
> [GOLDBERG LAWYER]: Stop. Okay. Inappropriate.

[MS.] ALLEN:  Okay.  Well, he can't read.

[MR. POTTER]:  I can read.

[MS.] ALLEN:  I mean, you're trying to trick him.

[GOLDBERG LAWYER]:  Okay.  Can we take a break?

[MS.] ALLEN'S LAWYER]:  No, you don't need to.

[GOLDBERG LAWYER]:  Okay.  I'm going to ask you not to interrupt when I'm asking questions.

[MS.] ALLEN:  Whatever.

[GOLDBERG LAWYER]:  You have to—

[MS.] ALLEN:  You're a fricken liar.  And I know it.

[GOLDBERG LAWYER]:  You have an attorney.

[MS.] ALLEN:  You're full of shit.

[MS.] ALLEN'S LAWYER]:  Hey.

[GOLDBERG LAWYER]:  You have an—

[MS.] ALLEN:  I'm sorry.  But I'm tired of this shit.

[MS. ALLEN'S LAWYER]:  Hey, this is all—

[MS.] ALLEN:  I am tired of this.

[MS. ALLEN'S LAWYER]:  Jennifer, this is all on the record.  Stop it.

[MS.] ALLEN:  I don't care.  I'm tired of it.

[GOLDBERG LAWYER]:  Yeah, let the record—

[MS.] ALLEN:  These fuckers have been badgering me for months.  Fuck you.  This is all true.  This is bullshit.  I don't care if it's on the record.  It's true.

[MS. ALLEN'S LAWYER]:  Stop.

[MS.] ALLEN:  They deserve it.

THE WITNESS:  Come on, Jennifer.

[MS.] ALLEN:  Whatever.  I'm turning you in to the bar.  I don't care.  This is fraud.  I am sorry, but they have it coming.

9

Ex. 3, at 20-21. After a bit more of this sort of exchange, the Goldbergs' lawyer insisted on taking a break.

When the deposition continued, Mr. Potter testified that when the will was brought for the Potters to sign in December 2014, it was brought by Dr. Goldberg. But he also testified twice more that when the supplemental declaration was brought for the Potters to sign, it, too, was signed in Dr. Goldberg's presence.

An evidentiary hearing was held a couple of days later. At the Goldbergs' request, and with Ms. Allen's agreement, only the Goldbergs' challenge that the will had not been executed with the formalities required by RCW 11.12.020 was at issue. If that challenge to the 2014 will was not dispositive, the parties agreed that additional discovery would be conducted before trial of the remaining claims raised in the TEDRA petition.

The Goldbergs called Mr. Potter and Mr. Visser as witnesses. Mr. Visser testified consistent with the facts recounted above. No objection was made when he testified about statements made to him by Mr. Potter. His recorded interview was played during his testimony without objection.

When questioned during the Goldbergs' case, Mr. Potter testified it was Dr. Goldberg who brought him and his mother the will in 2014 and was present when they signed as witnesses. He testified it was Ms. Allen who brought the supplemental declaration to the house for signature. (On the latter point, he was confronted with his conflicting deposition testimony.) Mr. Potter testified that when presented with and

10

asked by Ms. Allen to execute the supplemental declaration, he did not review anything other than the declaration itself. Before the Goldbergs rested their case, the will, the 2018 declaration, the transcript of Mr. Potter's deposition, and the transcript of his interview by Mr. Visser were all admitted as exhibits without objection.

Ms. Allen called as witnesses Mr. Potter, her husband, and a former contractor who offered little admissible testimony. She concluded by testifying on her own behalf.

When called as a witness in Ms. Allen's case, Mr. Potter testified he had two alcoholic beverages before his January 2019 interview by Mr. Visser but said he wasn't "shit-faced." RP (Trial) at 80. He testified that given the passage of time, he had some confusion about when the will was signed. Asked if Ms. Allen instructed Mr. Potter to call Mr. Visser to correct statements made during his interview, Mr. Potter testified, "She said it might be good." RP (Trial) at 83. Asked if Mr. Visser "intimidate[d] you at all?," Mr. Potter answered yes, because "he's a big guy." RP (Trial) at 84. Mr. Visser had formerly been in law enforcement, and when Mr. Potter was asked by Ms. Allen's lawyer, "[D]id you think he was still a deputy sheriff?," Mr. Potter answered, "Yeah, kind of. Yeah." RP (Trial) at 84-85.

Ms. Allen's husband testified that he interrupted Mr. Visser's interview of Mr. Potter because horses were loose, but the horses were "already caught up" when Mr. Potter got to the barn. RP (Trial) at 91. He testified that Mr. Potter was "totally drunk" the afternoon he was interviewed by Mr. Visser. *Id.* He acknowledged that he and Ms.

11

Allen were present when Mr. Potter called Mr. Visser to correct what he had said when interviewed. RP (Trial) at 92-93.

Ms. Allen testified she had nothing to do with the preparation of Dr. Goldberg's will and did not take it to the Potters to be signed.

At the conclusion of the hearing, the trial court took the matter under advisement. It reconvened the parties a week later to deliver its oral ruling. It announced its conclusion that the will was not executed in accordance with the required formalities based on its finding that Dr. Goldberg was not the one who took the will to the Potters for signature, so they did not witness its execution.

Ms. Allen timely moved for reconsideration, but without raising any issue of the admissibility of Mr. Potter's statements when interviewed. The Goldbergs filed proposed findings of fact and conclusions of law and moved for an award of attorney fees and costs.

A hearing on Ms. Allen's motion for reconsideration, the proposed findings of fact and conclusions of law, and the Goldbergs' motion for attorney fees was held on June 5, 2019. After hearing argument from both sides on all issues, the trial court orally denied reconsideration, identified changes to be made to the proposed findings and conclusions, and took the attorney fee issue under advisement.

The final findings and conclusions and an order awarding attorney fees were noted for presentment on August 9, 2019. After the trial court announced its attorney fee

12

award, Ms. Allen's lawyer informed the court that Ms. Allen wished to lodge a new objection to the final proposed findings and conclusions. The lawyer explained, "I've been made aware since our hearing that Potter's statements to Visser and the recording are hearsay under Evidence Rule 801." RP (Aug. 9, 2019) at 6-7. He continued that while the evidence was admissible as a prior inconsistent statement under ER 613, it "can be used only for impeachment. It's not substantive evidence." RP (Aug. 9, 2019) at 7.

The trial court refused to modify any of its findings, explaining that because there was no hearsay objection at the evidentiary hearing, "there is a waiver at that point." RP (Aug. 9, 2019) at 13. The court agreed that the interview "impeachment[-]wise totally impeaches Mr. Potter. Mr. Potter did not have any credibility at all throughout his testimony and that was shown in multiple ways." *Id.*

Ms. Allen timely appealed. This Division Three panel considered the appeal without oral argument after receiving an administrative transfer from Division Two.

ANALYSIS

Following a bench trial, appellate review is limited to determining whether substantial evidence supports the trial court's findings of fact and, if so, whether the findings support the conclusions of law. *State v. Stevenson*, 128 Wn. App. 179, 193, 114 P.3d 699 (2005). "Substantial evidence" is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise. *Id.* The trial court's resolution of witnesses' differing accounts of events are entitled to great deference. *State v. Harrington*, 167

13

Wn.2d 656, 662, 222 P.3d 92 (2009). Appeals courts treat unchallenged findings of facts supported by substantial evidence as verities on appeal. *Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 169, 795 P.2d 1143 (1990). We review challenges to a trial court's conclusions of law de novo. *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008).

I.    MS. ALLEN'S CHALLENGE TO EVIDENCE SUFFICIENCY

The argument section of Ms. Allen's opening brief is devoted almost entirely to her challenge to the trial court's findings, based on Mr. Potter's statements when interviewed, that it was Ms. Allen, not Dr. Goldberg, who brought the will to the Potters and asked them to sign it as witnesses. Under RCW 11.12.020(1), "[e]very will . . . shall be attested by two or more competent witnesses, by subscribing their names to the will, or by signing an affidavit that complies with RCW 11.20.020(2), *while in the presence of the testator and at the testator's direction or request*." (Emphasis added.) Once a will has been admitted for probate, "RCW 11.24.030 provides that . . . the will is presumed to be valid, and the burden is upon the contestants to prove the contrary by clear, cogent, and convincing evidence." *In re Estate of Reilly*, 78 Wn.2d 623, 656, 479 P.2d 1 (1970).

Ms. Allen argues that the evidence that she, not Dr. Goldberg, presented the will for signature by the Potters was insufficient, because Mr. Potter's unsworn statements to that effect were hearsay, admissible only for impeachment. Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. ER 801(c). In

14

general, hearsay evidence is inadmissible at trial. ER 802. However, "[a] witness may be impeached with a prior out-of-court statement of a material fact that is inconsistent with his testimony in court, even if such a statement would otherwise be inadmissible as hearsay." *State v. Clinkenbeard*, 130 Wn. App. 552, 569, 123 P.3d 872 (2005). "Impeachment evidence affects the witness's credibility but is not probative of the substantive facts encompassed by the evidence." *Id.*

Rulings on evidence are governed by ER 103, which provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one *admitting* evidence, *a timely objection or motion to strike is made*, stating the specific ground of objection, if the specific ground was not apparent from the context." ER 103(a)(1) (emphasis added). Although ER 103 most often comes up in the context of evidentiary errors raised for the first time on appeal, the same principle applies in the posttrial context, so the fact that Ms. Allen's belated evidentiary objection came up in a final hearing in the trial court does not change the analysis. *See* 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 103.7, at 46 (6th ed. 2016); *see also Estate of Stalkup v. Vancouver Clinic, Inc., P.S.*, 145 Wn. App. 572, 584-85, 187 P.3d 291 (2008) (new trial could not be granted on basis of defense expert failing to phrase testimony in terms of reasonable medical certainty because plaintiff failed to object during trial).

The rule is reasonable and, frankly, necessary to the effective conduct of trial. As the trial court observed, parties frequently forego valid objections during trial for strategic reasons. Their adversaries should be able to rely on evidence that is admitted without objection, without concern that success at trial might be derailed by new objections on appeal.

The legal authority Ms. Allen cites for the proposition that a motion for reconsideration can preserve for appeal an issue or theory not raised at trial has no application here.[3] Those cases depend on a belatedly-raised issue or theory that is supported by facts established at trial. Facts established at trial are those found by the court and supported by unobjected-to evidence. In this case, the facts established at trial include the substance of Mr. Potter's statements that Ms. Allen, not Dr. Goldberg, brought the December 2014 will to the Potters for signature. No belatedly-raised issue or theory can change the evidence.

Because Ms. Allen failed to timely and specifically raise a hearsay objection at the evidentiary hearing, she waived that objection for purposes of posttrial proceedings and

---

[3] *See* Reply Br. of Appellant at 4-10 (citing *Reitz v. Knight*, 62 Wn. App. 575, 581 n.4, 814 P.2d 1212 (1991) (issue of adverse possession was preserved for appellate review because appellant made extensive adverse possession arguments in his motion for reconsideration based on evidence presented at trial); *Newcomer v. Masini*, 45 Wn. App. 284, 287, 724 P.2d 1122 (1986) (issue of subrogation was preserved for appellate review because appellant, on reconsideration, expanded and refined details of an argument already presented at trial).

appeal. The trial court did not err in treating the evidence of Mr. Potter's statements as substantive. Mr. Potter was the only witness at the evidentiary hearing who claimed to have knowledge of the circumstances under which the Potters signed the will. While there was conflicting evidence of what those circumstances were according to Mr. Potter, it was for the trial court to decide which evidence to believe. The court chose to believe Mr. Potter's statements to Mr. Visser, which is substantial evidence supporting its finding by clear and convincing evidence that Dr. Goldberg was not present when the Potters signed the will.

II.     OTHER CHALLENGES TO THE TRIAL COURT'S FINDINGS

Ms. Allen makes assignments of error to 17 of the trial court's findings of fact, acknowledging that her assignments of error are all in support of her legal argument that Mr. Potter's statements could be considered only for impeachment. *See* Br. of Appellant at 5-6.

Ten of the findings identified (findings 3.11, 3.13, 3.14, 3.17, 3.18, 3.19, 3.20, 3.25, 3.27, and conclusion 4.8) are assigned as error only, or mostly, because they rely on evidence of Mr. Potter's statements to Mr. Visser as substantive evidence or because the trial court referred to Mr. Potter's unsworn statements as "testimony." Assignments of error on the basis that Mr. Potter's unsworn statements could not be relied on as substantive evidence are rejected for the reasons set forth above.

As for the challenge that Mr. Potter's unsworn statements were sometimes referred to in the findings as "testimony," we observe that in announcing its oral decision the trial court never referred to those statements as "testimony." *See* RP (May 2, 2019) at 10-13. It is clear from the trial court's rejection of Ms. Allen's belated hearsay challenge that it understood Mr. Potter's unsworn statements to Mr. Visser were only that, not testimony. The erroneous "testimony" label was introduced by the Goldbergs' proposed findings and conclusions. *See* CP at 228-31. We reject the implication that by failing to correct that label, the trial court erroneously viewed Mr. Potter's unsworn interview as testimony.

Ms. Allen's remaining assignments of error afford no basis for rejecting the trial court's decision invalidating the December 2014 will for the following reasons:

*Finding 3.8.* That Mr. Visser set his laptop on the trunk of the car rather than the hood is immaterial. The remaining challenge to the finding does not identify error; it merely identifies how Ms. Allen would weigh the evidence.

*Finding 3.10.* The evidence supports the finding that on the afternoon he interviewed Mr. Potter, Mr. Visser asked Ms. Allen several times to move away. *See* Ex. 4, at 4-8. Her argument that two attempts to interrupt the interview cannot be characterized as "repeated" is unpersuasive.

*Finding 3.17.* Insofar as Ms. Allen objects to this finding as reflecting Mr. Visser's interpretation of Mr. Potter's statement that he "f[***]ed" up, no objection was made to the question or answer at trial. *See* RP (Trial) at 66-67.

*Finding 3.18.*  Insofar as Ms. Allen objects to the statement in the finding that "*there is no evidence* Tracy Potter felt intimidated" in answering Mr. Visser's questions, we agree this is incorrect.  CP at 295 (emphasis added).  What the trial court explained in delivering its oral opinion was that it did not believe Mr. Potter was intimidated by Mr. Visser.  *See* RP (May 2, 2019) at 17.  In view of the trial court's explanation that it did not believe Mr. Potter was intimidated—a credibility call that was the court's to make— the misstatement that "there is no evidence" is immaterial.

*Finding 3.21.*  There is no material difference between Ms. Allen's stated concern that Mr. Potter would be "twist[ed]," around in his deposition, Ex. 3, at 23, and the trial court's finding that Ms. Allen instructed him not to get "turned around," CP at 296.  The assigned error otherwise merely identifies how Ms. Allen would weigh the evidence.

*Finding 3.22.*  The statement in the finding that the supplemental declaration was presented to the Potters "months" after Dr. Goldberg's death rather than one month after his death is immaterial.  CP at 296.  The gist of the finding is that Dr. Goldberg, having died, could not have brought the supplemental declaration to the Potters.

*Findings 3.26 and 3.28.*  Ms. Allen merely questions the relevance of these findings and, from that, suggests "that the trial court may not have understood or absorbed the evidence."  Br. of Appellant at 17-18.  It is clear from the posttrial hearings and the findings and conclusions as a whole that the trial court understood and absorbed the evidence.

19

*Finding 3.29.* Reasonably read, the "different testimony" of Mr. Potter referred to in the finding is testimony different from the truth. CP at 297. While Ms. Allen is correct that her declarations filed outside the context of the trial are not relevant, she does not explain how the reference to them in this finding is material to the trial court's ultimate findings or conclusions of law.

Except for a couple of immaterial errors, substantial evidence supports the trial court's findings of fact. Its findings of fact support its conclusions of law.

III.    ATTORNEY FEES

Ms. Allen challenges the attorney fees and costs awarded against her in the trial court, but only on the basis that they were "based on findings not supported by the evidence," a premise we have rejected. Br. of Appellant at 48.

Both parties seek an award of reasonable attorney fees and expenses on appeal under RAP 18.1 and RCW 11.96A.150. RAP 18.1(a) authorizes an award of reasonable attorney fees and expenses on appeal "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses." RCW 11.96A.150 gives courts broad authorization to award attorney fees to "proceedings governed by [Title 11 RCW], including but not limited to proceedings involving trusts, decedent's estates and properties, and guardianship matters." RCW 11.96A.150(2). Further, under TEDRA, this court has great discretion in awarding fees and may "consider any relevant factor,

20

including whether a case presents novel or unique issues." *In re Guardianship of Lamb*, 173 Wn.2d 173, 198, 265 P.3d 876 (2011).

We award the Goldbergs their reasonable attorney fees and costs on appeal subject to their timely compliance with RAP 18.1(d).

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Fearing, J.